ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -                                  )
                                             )
Central Company                              )      ASBCA No. 62624
                                             )
Under Contract No. FA4654-19-C-A006          )

APPEARANCE FOR THE APPELLANT:        Mr. Chris Yang
                                        Representative

APPEARANCES FOR THE GOVERNMENT:      Jeffrey P. Hildebrant, Esq.
                                        Air Force Deputy Chief Trial Attorney
                                     Jason R. Smith, Esq.
                                     Lori R. Shapiro, Esq.
                                     Lt Col John C. Degnan, USAF
                                        Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE SMITH

        In this appeal, we resolve appellant Central Company's (Central) challenge to
respondent Air Force's (the government) default termination of Central's $348,688
design/build construction contract. The parties have elected a written disposition
under Board Rule 11.[1] Central argues primarily that the government's termination
failed to account for obstacles to Central's performance caused by the COVID-19
pandemic (COVID). The government responds that Central made almost no progress
during the majority of the performance period which was prior to COVID and that
Central did not demonstrate any legitimate COVID delays. For the reasons discussed
below, we find that the government's decision to terminate Central's contract for
default was justified and Central's arguments against the termination are unavailing.
As a result, we deny the appeal.

---

[1] During earlier proceedings, the government moved for summary judgment and
    Central submitted its position in response to the government's motion. The
    government then replied to Central's response. Subsequently, the parties
    agreed to a Rule 11 disposition, adopted their earlier submissions as their
    Rule 11 briefs, and supplemented the record before it was closed. We have
    considered Central's positions in its Rule 11 briefing and its prior
    communications with the government.

FINDINGS OF FACT

Central's $348,688.00 contract No. FA4654-19-C-A006 (the contract) was executed on September 30, 2019, by Central's president Mr. Chris Yang (R4, tab 5 at 2, 8; tab 6). The contract was for the design and construction of a fairly small (2,400 square feet) one-story metal Civil Engineer Squadron storage building and yard at Grissom Air Reserve Base, Indiana (R4, tab 1a at 3, 7). The contract required all work to be completed by May 19, 2020, which was 180 days from the November 21, 2019, notice to proceed (NTP) (R4, tab 1 at 1; tabs 17, 35).

The contract contained typical preconstruction paperwork requirements for a relatively simple[2] government construction project (bonds, plans, permits, schedule, submittals, design reviews, etc.) (R4, tab 1a at 8-9; tab 1f at 5; tab 16 at 2-3). The preconstruction documents were to be sequentially submitted to the government for review, comment and approval and the contract explicitly stated that construction could not begin "prior to Government approval of plans and specifications" (R4, tab 1a at 15). As with any design/build project, a fully reviewed and approved design was critical to beginning any field work, and the contract here required a sequential three-phase submittal/review/approval process at 35%, 95%, and 100% of the design (R4, tab 1a at 7- 8, 10).

Central's Performance Prior to COVID

From contract award onward, progress was slow or non-existent (*see e.g.* R4, tab 27 at 5). The NTP was delayed for lack of Central's bonding (R4, tab 8). Deadlines for basic startup submissions came and went – often until the contracting officer reminded Central of its obligations (*see e.g.* R4, tabs 27, 35). The government attempted to assist Central, including in-person meetings, examples of necessary forms, and pointers regarding efficient ways to prepare documents (R4, tabs 18-20, 27). Central replied to the contracting officer's reminders with several promises such as "I will get it done soon," "the plan will be ready next week," "[o]ur Architect should get the plan ready this week, and I will try to get all paper work ready too" that were not kept (R4, tabs 18, 27). By February 28, 2020, over halfway through the allotted performance time, and before COVID significantly affected the United States,

---

[2] The building was solely for storage of "clothing, furniture, tents, containers, and miscellaneous construction tools" so the physical features were straightforward and did not have any particularly complicated elements (R4, tab 1a at 5). For example, the building required a fire protection system and basic electric power, but not a plumbing or HVAC system (*see e.g.* R4, tab 1a at 5-6; tab 27 at 6-10, 15).

Central's first and only submission (made on January 12, 2020, disapproved on January 17, 2020) was not acceptable, and most of the other required documents – including the 35% design, had not been submitted by Central at all (R4, tabs 24, 27). Another month later, on March 26, 2020, Central's second and third submissions were again deficient and many documents remained missing (R4, tab 28). Central's project schedule – the fundamental tool by which contract progress is measured – was sketchy and noncompliant. *Id.* With less than two months remaining, the contracting officer's March 26, 2020, email summarized Central's lack of progress and once again provided specific instructions regarding outstanding items. *Id.* On March 27, 2020, Central wrote "[w]e are really sorry for the delay; we are doing everything we can to catch up" (R4, tab 28 at 1).

In April and May 2020, Central continued to demonstrate a lack of attention to the sequence in which the project was to proceed and indicated vaguely that it was "ready to start the project," that elements of the design were "finished" and that it was "ready to do the site preparation work" when none of the necessary approvals had been obtained (R4, tabs 27-28). The government's April 16, 2020, feedback on Central's third submission identified numerous fundamental problems with Central's documents (R4, tabs 24, 26). By the contract completion date of May 19, 2020, Central still did not have an approved progress schedule and none of Central's design documents were approved (R4, tab 33). On May 20, 2020, the contracting officer issued a show cause notice, to which Central responded on May 26, 2020 (R4, tabs 33- 34). On June 4, 2020, approximately two weeks after the completion date and with 0% of the work completed, Central's contract was terminated for default for failure to meet the contract completion date without a valid excuse (R4, tab 35). The termination notice considered COVID and determined that it did not excuse Central's lack of progress. *Id.*

COVID's Effect on Central's Performance

The first indication in the record regarding COVID came in an email from Central on March 25, 2020, when four months of the six-month performance period had already passed, and Central had not made any palpable progress on preconstruction requirements (R4, tab 27 at 1-2). By that date, Central had not re-submitted, much less received approval of, its design (R4, tab 33). Consequently, completion of the design review process, the other preconstruction requirements, and construction – all by May 19, 2020, was highly unlikely. Further, Central's March 25, 2020, email indicated awareness of COVID and some degree of concern, without identifying any specific impediment to the completion of the design, as follows:

> I saw the notice of the DOD about the coronavirus crisis;
> does it means most contracts in the emergence area are

3

given more time to finish. We are still try to finish it as soon as possible on our side, but we do have lots of difficulties dealing with it.

(R4, tab 27 at 1)

Similarly, on March 27, 2020, Central wrote "I will redo the [form AF] 3000 as well; our site preparation contractor is ready and can start anytime; I do worry about this coronavirus thing may get worse and we have to stop in the middle, that may cause some losses" (R4, tab 29 at 1).

On April 27 and 28, 2020, when the contracting officer asked about specific impact to Central's work, Central wrote that "[o]ne of our subcontractor's worker was tested positive, so all their employee have to put into quarantine. Right now, the supplier we use also shut down due to the virus. I believe that this will at least delay us for 120 days" (R4, tab 32 at 15).

In response to the May 20, 2020, show cause notice, Central described some COVID impacts, but again without meaningful detail or clarity:

> This corona virus pandemic really has a very serious damages for our business; not only our subcontractor's employee tested positive, but also the supplier had to shut down the factory; even our bank, Chase bank, is no longer open the business banking section, only through the phone call, which is very slow. So we are asking for an extension for the pole barn project; now we are 75% done for the engineer drawing and can start the site preparation in 7 days.

(R4, Tab 34)

At the time, Central had a "pole barn project" with a different agency,[3] and Central was not "75% done" with any aspect of this project, much less the design. So these purported COVID impacts may not have even applied to the contract at issue here.

_____

[3] The parties referred to this project as "Grissom Reserve Base," and "Construct CES Building." *See e.g.* R4, tabs 27, 32. The record does not contain any other reference to a "pole barn project" except Central's April 2, 2020, statement that "we are finishing one similar pole barn project for Army Corps of Engineers . . ." (R4, tab 32 at 16).

4

Central responded to the June 4, 2020, termination notice as follows:

> Thank you for the help you gave us and we really appreciate. It's our fault that we did not communicate with you more often; I checked back the old dates, our subcontractor's employee tested positive in February this year. The most important thing was that after we turned in the whole set design (we had the plan back in November 2019), we should ask for 35% approval for design, that should be much easier.

(R4, Tab 48)

## DECISION

In the appeal of a default termination, the government first bears the burden to make a *prima facie* case justifying its default termination. *Cantrill Development Corp.*, ASBCA No. 30160 *et al.*, 89-2 BCA ¶ 21,635 at 108,849; *Lisbon Contractors, Inc. v. United St*ates, 828 F.2d 759, 763-64 (Fed. Cir. 1987). The contracting officer's default decision must not be arbitrary or capricious or an abuse of discretion. *Darwin Constr. Co. v. United States*, 811 F. 2d 593, 597 (Fed. Cir. 1987).

After the government makes its *prima facie* showing of justification for the default termination, the burden shifts to the contractor to prove its default was excusable and its failure to perform was beyond its control and without the fault or negligence of both itself and its subcontractors or suppliers. *Cantrill*, 89-2 BCA ¶ 21,635 at 108,849; *Mark Smith Constr. Co.*, ASBCA Nos. 25058, 25328, 81-2 BCA ¶ 15,306. Here, Central made virtually no progress on the contract during its entire term so the government's termination was *prima facie* justified. Central's argument that COVID impeded its performance starting in February or March 2020 is not even clearly alleged, much less supported by the record.

Due to the informality of Central's Rule 11 briefing, discussed above, we have examined the entire record and we glean the following arguments by Central.[4] First,

---

[4] Given that Central is represented, *pro se*, by its president, it is proper for us to be generous in interpreting its filings in terms of recognizing arguments; but being *pro se* does not change Central's burden of proof or the need for it to present evidence to support its allegations. "This Board has always accorded *pro se* litigants leeway administratively, but the legal standards we apply must, of necessity, be the same for everyone." *Atl. Maint. Co.*, ASBCA No. 40454, 96- 2 BCA ¶ 28,472 at 142,195; *John Shaw LLC d/b/a Shaw Building Maint.*, ASBCA Nos. 61379, 61585, 19-1 BCA ¶ 37,216 at 181. Unfortunately, as will

Central's contemporaneous emails, including its response to the show cause notice, indicated some concern for possible future impacts of COVID (R4, tabs 27, 29, 34). But did not assert any actual impacts to Central's performance, past or future. *Id.* For instance, the purported shutdown of Central's subcontractor is unexplained both to duration and effect upon the work Central was doing at the time. *Id.* Nor is there any evidence that the positive test at the subcontractor was an insurmountable obstacle to Central's work. *Id.* Whatever delay the positive COVID test purportedly caused has not been shown to be outside of Central's ability to mitigate.

Central also alleged that "the supplier had to shut down the factory" but, assuming the "supplier" is even different from the "subcontractor" discussed above, which is unclear, Central again did not provide any detail or evidence that this purported supply problem actually affected Central's work. *Id.* A lack of supplies should only affect construction, not the preparation of a design and submittal of acceptable preconstruction paperwork, which is where Central failed long before it would have been contractually able to begin using supplies.

Central's May 26, 2020, show cause response also alleged that it had to do business with its bank over the phone rather than in a local branch office, which was slow. *Id.* Again, Central vaguely identifies this problem without any evidence to support it and certainly without any persuasive proof that slow banking somehow rendered Central unable to produce acceptable preconstruction documents. In short, even if the problems cited in Central's show cause response existed and emanated from COVID, Central failed to allege or demonstrate that those problems actually delayed Central's preconstruction work – which appears to have been almost irretrievably behind schedule prior to COVID anyway.

In its Rule 11 brief, Central further argues that "the Air Force did not realize how bad the situation was" (app. br. dtd. January 21, 2021 at 1) which is a general statement about COVID that probably applied to most people in early 2020, but is irrelevant to this appeal without more specificity. If "the situation" with Central's performance was "bad" (*i.e.* halted by COVID), it was Central's obligation to contemporaneously demonstrate when the delays occurred and their real effect upon Central's work, or at least in response to the show cause notice, or in this appeal -- none of which has been done.

Central also seems to allege for the first time in its Rule 11 brief that it completed, *and submitted*, its three-page design on November 5, 2019, prior to the notice to proceed. *Id.* The government disputes this allegation (gov't reply br. dtd. February 11, 2021 at 2). One element of the design (the "truss drawing" on page one)

be seen throughout, many of Central's allegations lack cognizable evidentiary support.

6

is dated November 4, 2019 while the remainder of the design is undated (R4, tab 27 at 6). So the truss drawing does appear to have existed prior to NTP. *Id.* But there is no transmittal or other evidence to support the new allegation that the complete design, such that it is, was submitted prior to March 24, 2020, when Central submitted the same three-page design document as "Material Approval Submittal 03" (R4, tab 24 at 1-12). Nor is there any kind of follow-up in the record after November 5, 2019, something that would be expected if Central had indeed submitted its design prior to NTP. And of course, the government's review of the March 24, 2020, submission showed that the three-page design was flawed in many fundamental ways (R4, tab 24 at 2). So even if Central did submit its design in November 2019, that does not necessarily mean that speedier progress would have occurred. Regardless of when Central submitted its design, it does not excuse Central's other failures that resulted in 0% contract completion by the time Central should have been 100% complete.

Finally, Central argues that "the Air Force changed project managers two times before Mr. Michael Beckstrom [who was actually the contracting officer] took over" (app. br. dtd. January 21, 2021, at 1-2). This argument suggests that government personnel changes somehow affected Central's ability to timely perform. But Mr. Beckstrom was assigned to the project from November 8, 2019, onward – before the NTP and for the entire contract performance period (R4, tabs 8, 35). Moreover, Central has not identified any particular way that the pre-NTP change would have affected its ability to perform. So Central's argument is factually unfounded. Instead, despite any changes to any government personnel, the government responded promptly to all of Central's communications (*see e.g.* R4, tab 27 at 1-2; tab 32).

In sum, considering all of Central's positions, the record does not support *any* argument that COVID impeded Central's work to the point where Central's overall lack of progress was beyond its control.

## CONCLUSION

The government's termination was not arbitrary, capricious, or an abuse of discretion. Our review of the entire record and Central's arguments has not located any excuse or delay beyond the fault or control of Central sufficient to overturn the government's decision. Central's challenge to the government's default termination is denied.

Dated: February 2, 2022

BRIAN S. SMITH
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 62624, Appeal of Central Company, rendered in conformance with the Board's Charter.

Dated:  February 3, 2022

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

9